PEÑA, J.
*785 INTRODUCTION
When an invited guest, knowing his friend is asleep in the living room, gets into a bed where his friend's wife is asleep and digitally penetrates her vagina without her knowing consent but without her initial objection or resistance, has he committed sexual penetration by artifice, pretense, or concealment in violation of Penal Code section 289, subdivision (f) ? After a jury trial, the jury concluded the answer is "yes" and convicted defendant Russell Dusty Fleming of one count of sexual penetration by fraud ( Pen. Code, § 289, subd. (f) ; unless otherwise specified, all statutory references are to the Pen. Code.) On December 15, 2015, the trial court sentenced defendant to the mitigated term of three years in prison.
Defendant contends on appeal he did not violate section 289, subdivision (f) because there was no substantial evidence his conduct included actions qualifying as pretense, artifice, or concealment. Defendant argues CALCRIM No. 1051, the pattern jury instruction setting forth the elements of the offense, failed to set forth the element *77 that the jury must find a causal link between defendant's actions and the victim's belief. Defendant contends the court prejudiced him by removing a juror based on a finding of bias by the juror unsupported by the evidence. In the published portion of this opinion, we reject the first contention, and in the unpublished portion, we reject the latter contentions and affirm the judgment.
FACTS
Prosecution Case
The evening of December 12, 2014, defendant went out with friends for dinner and dancing to celebrate Taryn W.'s birthday. The party included Cheyenne, Blake and his wife D.P., and neighbors Megan and Mitchell. Cheyenne left after dinner because she was not old enough to drink alcohol. D.P. said they all drank enough that evening that they should not be *786 driving, and she herself was intoxicated. But D.P. was not suffering from a hangover the next morning and had last consumed alcohol eight hours earlier.
About 12:30 a.m., the group took a taxi back to the home of Blake and D.P. Taryn W. went to sleep in Cheyenne's bedroom. Defendant was carried into an unoccupied bedroom by Megan and Mitchell, who shut the door. Megan and Mitchell left and went home. Blake, D.P., and Cheyenne watched a movie in the family room. All three fell asleep on the couch.
About 7:00 a.m. the next morning, defendant entered the family room to retrieve his cell phone from underneath the sofa and called his employer to say he was not coming to work. D.P. was awakened by defendant, got up from the sofa, and went into her bedroom and shut the door. D.P. changed into a tank top and pajamas before climbing into bed around 7:30 a.m. She was alone in her room. D.P. slept facing the wall and bedroom closet.
Sometime before 9:15 a.m., defendant went into D.P.'s room without her noticing. D.P. was sleeping. Defendant climbed into Blake's side of the bed and lay down behind D.P. underneath the covers. D.P. felt a body against her and thought it was her husband. D.P. could not see the person behind her. Defendant did not say anything. Defendant groped D.P., putting his fingers inside her vagina. D.P. thought her husband was with her in bed and "started getting into it."
D.P.'s cell phone rang. D.P. explained: "So I woke up to-because my phone rang and I realized that somebody was in bed with me and he was touching me, and I thought it was my husband Blake." As D.P. turned over and reached across Blake's side of the bed to retrieve her phone from the dresser, defendant pulled the covers over his head. D.P. pulled the covers back and saw defendant. She screamed. D.P. was shocked and deeply disturbed. Defendant had been friends with her husband for a long time and was in their wedding.
Defendant and D.P. never had a sexual relationship. D.P. did not consent to defendant's conduct. D.P. did not give defendant permission to touch her and felt violated. D.P. ran out to the living room and woke her husband. Blake confronted defendant in the master bedroom, ordering defendant to get out of his bed. Defendant pretended he did not know what was happening. Defendant was not wearing a shirt and his belt was on the floor. Blake told defendant to leave.
D.P. was very upset and cried. Blake could not comfort her. D.P. did not sleep in her bed for a month; she reported the incident to the police on Monday, two days after the incident.
*78 *787 Cheyenne testified she helped put Taryn to bed in Cheyenne's bedroom. She remembered defendant coming to the couch in the living room on Saturday morning to get his cell phone. Defendant said he had to call work. Cheyenne got up about 15 minutes later to go to her bedroom. When she looked in the room, she saw defendant lying next to Taryn, who was asleep. Defendant was wearing jeans with no shirt. When defendant saw Cheyenne, he patted the bed and said there was room for three. Cheyenne refused and ordered him out. Defendant finally got out of the bed and Cheyenne crawled into it. Defendant stayed in the bedroom, walking around for a little while.
Defendant briefly left, but after a few minutes he crawled back into the bedroom on his hands and knees. Defendant looked up at Taryn from the floor and said, " 'You look beautiful when you're sleeping.' " Cheyenne again told defendant to get out. Before leaving the room, defendant said, " 'You are evicting me from your room?' " Sometime after defendant left the bedroom the second time, Cheyenne heard D.P. yelling and hysterical. D.P. was accusing defendant of touching her. Defendant also became hysterical and said nothing had happened.
Defense
Deputy Rudolfo Tafoya of the Fresno County Sheriff's Department prepared a report from D.P.'s description of the incident on December 15, 2014. D.P. reported the crime as a rape. On direct examination D.P. testified she had asked, "Blake, what are you doing?" after the incident. D.P. told Deputy Tafoya she had said, "[Defendant], what are you doing here?" When D.P. met with the investigator at the district attorney's office on February 24, 2015, she made no reference to asking, "Blake, what are you doing?" Since D.P. had already washed her night clothes and the bed sheets before the officer came to her home, there was no physical evidence for him to collect.
DISCUSSION
I. Evidence of Artifice, Pretense, or Concealment
Introduction
Defendant contends his conviction must be reversed because there was no evidence he committed pretense, artifice, or concealment when he touched D.P., an element of section 289, subdivision (f). Section 289, subdivision (f) has the following elements: (1) the defendant committed an act of sexual penetration with another person; (2) the penetration was accomplished using a foreign object; (3) the other person submitted to the act because she believed the person committing the act was someone she knew *788 other than the defendant; and (4) the defendant tricked, lied, used an artifice or pretense, or concealed information, intending to make the other person believe that he was someone she knew, while intending to hide his own identity. ( § 289, subd. (f) ; CALCRIM No. 1051.)
An earlier version of the statute and the jury instruction included the element that at the time of the sexual penetration, the alleged victim submitted to the act under the belief the defendant was the victim's spouse. Beginning on September 9, 2013, section 289, subdivision (f) was amended to eliminate this element. (Stats. 2013, ch. 282, § 2, eff. Sept. 9, 2013.) The act in question here occurred more than a year later in December 2014, but the trial court included in the jury instructions the element that the defendant not be the spouse of the victim.
Defendant asserts the only prior opinion on point, People v. Leal (2009) 180 Cal.App.4th 782, 103 Cal.Rptr.3d 351 ( Leal ), is *79 inapposite because it involved a different factual scenario and misinterpreted subdivision (f) of section 289. We reject defendant's argument.
Substantial Evidence
When a defendant challenges the sufficiency of the evidence, appellate courts must review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence-evidence which is reasonable, credible, and of solid value-such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. This standard of appellate review is the same in cases in which the People primarily rely on circumstantial evidence. Although a jury must acquit if it finds the evidence susceptible of a reasonable interpretation favoring innocence, it is the jury and not the reviewing court that weighs the evidence, resolves conflicting inferences, and determines whether the People have met the burden of establishing guilt beyond a reasonable doubt. If the trier of fact's findings are reasonably justified under the circumstances, the opinion of the reviewing court that the circumstances may also be reconciled with a contrary finding does not warrant reversal of the judgment. ( People v . Casares (2016) 62 Cal.4th 808, 823-824, 198 Cal.Rptr.3d 167, 364 P.3d 1093.) After reviewing the evidence in the light most favorable to the prosecution, we determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. ( People v . Rangel (2016) 62 Cal.4th 1192, 1212-1213, 200 Cal.Rptr.3d 265, 367 P.3d 649.)
Unless the testimony of a single witness is physically impossible or inherently improbable, it is sufficient for a conviction. ( Evid. Code, § 411 ;
*789 People v . Young (2005) 34 Cal.4th 1149, 1181, 24 Cal.Rptr.3d 112, 105 P.3d 487.) An appellate court must accept the logical inferences the jury might have drawn from circumstantial evidence. ( People v . Maury (2003) 30 Cal.4th 342, 396, 133 Cal.Rptr.2d 561, 68 P.3d 1.) Before setting aside the judgment of the trial court for insufficiency of the evidence, it must clearly appear that there was no hypothesis whatever upon which there was substantial evidence to support the verdict. ( People v . Conners (2008) 168 Cal.App.4th 443, 453, 85 Cal.Rptr.3d 627 ; People v . Sanghera (2006) 139 Cal.App.4th 1567, 1573, 43 Cal.Rptr.3d 741.)
Analysis
In Leal , husband A. and wife T.C. celebrated her birthday in their duplex. Over the course of the evening, both drank large amounts of alcohol and became highly intoxicated. T.C. changed into her pajamas about 1:00 a.m. and went to sleep in their bedroom. She was joined by A. a few minutes later in their queen-sized bed. During that night, T.C. felt her vagina being penetrated by a penis as she was lifted up and placed on the edge of the bed. ( Leal , supra , 180 Cal.App.4th at p. 785, 103 Cal.Rptr.3d 351.) Although T.C. believed she was having sex with her husband, they had not had sex in that manner before, and in fact it was the defendant, who was a stranger and had entered the duplex through a window. ( Leal , at pp. 785-786, 103 Cal.Rptr.3d 351.)
T.C. did not feel hair on the back of the stranger, though A. had hair on his back, and she felt facial hair on the stranger, though A. had no facial hair. A. also usually woke her up and asked her if she wanted sex. Because T.C. was so intoxicated, she was unable to fully process the significance of these differences. When the encounter was over, T.C. lay back on her pillow and saw what appeared to be the *80 silhouette of someone leaving the room. She reached across the bed and found A. lying there. T.C. said she thought someone was there, but A. did not respond. T.C. was taken to a hospital and examined and a rape kit was prepared. Three years later the DNA profile made from the kit matched defendant's DNA. ( Leal , supra , 180 Cal.App.4th at p. 786, 103 Cal.Rptr.3d 351.)
Leal was convicted of rape and sexual penetration by artifice, pretense, or concealment (§§ 261, subd. (a)(5), 289, subd. (f) ), as well as assault with intent to commit rape (§ 220, subd. (a) ). ( Leal , supra , 180 Cal.App.4th at p. 785, 103 Cal.Rptr.3d 351.)
Leal noted California was one of only a handful of states with current laws defining rape to include acts of sexual intercourse in which the victim's apparent consent is induced by the belief the person performing the act is her spouse. ( Leal , supra , 180 Cal.App.4th at p. 788, 103 Cal.Rptr.3d 351.) As already noted, the element of personating a spouse is no longer an element of *790 section 289, subdivision (f). False personation of someone else to induce a person into a sexual act, however, is still an element of the offense, so cases discussing personating a spouse remain relevant analogies.
The court in Leal noted the only published case in California involving false personation of a spouse was a 1922 appellate court decision where the defendant obtained consent to intercourse after a feigned marriage. ( Leal , supra , 180 Cal.App.4th at p. 788, 103 Cal.Rptr.3d 351, citing People v . McCoy (1922) 58 Cal.App. 534, 208 P. 1016.) Leal turned to a case from North Carolina and one from Arizona. North Carolina had a statute " 'prohibiting carnal knowledge of a married woman by fraud in personating her husband.' " ( Leal , supra , at p. 788, 103 Cal.Rptr.3d 351, citing State v . Williams (1901) 128 N.C. 573, 37 S.E. 952, 953 ( Williams ).)
The wife in Williams was visiting her ill mother but was expecting her husband to join her that evening. During the night, the defendant lay down next to the sleeping wife, squeezed her hand, and pulled her towards him. When the wife asked who was there, the defendant said nothing initially. Thinking it was her husband, the wife asked when he had arrived. In a whisper, the defendant replied he arrived a little while ago. His voice was so low the wife did not suspect the defendant was not her husband and sexual intercourse followed. The court in Williams found sufficient evidence to sustain the defendant's conviction, reasoning the defendant knew he was not the woman's husband and he also knew the wife thought the defendant was her husband. The Williams court reasoned the defendant acted to "keep up the delusion until he accomplished his purpose." Williams found that even if the defendant lay down on the pallet by mistake, once he found the woman there and pulled her hand to solicit her to consent to intercourse, the defendant knew he was obtaining intercourse by fraud in personating the wife's husband. ( Williams , supra , 128 N.C. at p. 575, 37 S.E. at p. 953 ; see Leal , supra , 180 Cal.App.4th at p. 788, 103 Cal.Rptr.3d 351.)
Arizona had a statute similar to the North Carolina statute. In State v . Navarro (1961) 90 Ariz. 185, 367 P.2d 227 ( Navarro ), the victim went to sleep in the bedroom she shared with her husband while he and four other men, including the defendant, drank beer and watched television in another room. The victim remembered waking up in the middle of the night with defendant on top of her trying to have sexual intercourse. Believing the defendant to be her husband, the wife submitted to *81 him. In a matter of seconds she became aware he was not her husband and cried out asking who he was. The defendant covered her mouth with his hand and told her not to scream. When she cried and resisted, the defendant escaped from the house, leaving clothes behind. ( Navarro , supra , at p. 187 [367 P.2d at p. 228 ]; Leal , supra , 180 Cal.App.4th at p. 789, 103 Cal.Rptr.3d 351.) The Navarro court found the victim's testimony was *791 sufficient to establish both corpus delicti and conviction. ( Navarro , supra , at p. 189 [367 P.2d at p. 230 ]; Leal , supra , at p. 789, 103 Cal.Rptr.3d 351.)
The Leal court used the following definitions for artifice, pretense, and concealment:
"Artifice is defined as '[a] clever plan or idea, [especially] one intended to deceive.' (Black's Law Dict. (8th ed. 2004) p. 120, col. 2.) Pretense in this context is commonly understood to connote an act of pretending (Roget's II: The New Thesaurus (3d ed. 1995) p. 763), while concealment can refer to either an 'act of refraining from disclosure' or hiding to prevent discovery (Black's Law Dict., supra , at p. 306, col. 2)." ( Leal , supra , 180 Cal.App.4th at p. 789, 103 Cal.Rptr.3d 351.)
The court in Leal found the jury could reasonably infer the defendant employed deceptive methods when he quietly entered T.C.'s dark bedroom in the middle of the night, began to masturbate her as she was sleeping next to her husband, and engaged in sexual intercourse with her. Leal reasoned the jury could also reasonably conclude a woman in T.C.'s situation would reasonably believe these acts were being committed by her husband. ( Leal , supra , 180 Cal.App.4th at p. 789, 103 Cal.Rptr.3d 351.) Leal concluded that viewed in the light most favorable to the judgment, the evidence supported the jury's finding the defendant intended to induce T.C. to believe he was her husband, and for that reason she submitted to his sexual advances. ( Leal , supra , at p. 790, 103 Cal.Rptr.3d 351.)
Defendant argues the facts of Leal are distinguishable from the instant action. He further argues the holding in Leal improperly relies on the concept of passive concealment as used in civil tort law. Defendant contends section 289, subdivision (f) requires more than quiet passivity, but affirmative action by a defendant actively practicing actual artifice, pretense, or concealment. We disagree with defendant's constricted interpretation of these terms. Instead, we agree with the Leal court that, depending on the circumstances, passive concealment is fraud by misrepresentation where there is a duty to disclose. ( Leal , supra , 180 Cal.App.4th at p. 790, 103 Cal.Rptr.3d 351.) In any event, as we explain in greater detail, defendant's conduct was not passive concealment but a deliberately considered plan involving active concealment of his identity from D.P.
We also disagree with defendant's assertion the facts of this case are substantially different from those in Leal . D.P.'s husband was asleep on a couch and not in the bedroom he usually shared with D.P. As in Leal , defendant quietly entered that bedroom and stealthily entered the bed without waking D.P. while D.P. slept facing the wall away from him. Concealing his identity by not waking D.P. or making his presence known, he began to digitally penetrate D.P. while remaining behind her, outside of D.P.'s sight and while she was still asleep. These facts are nearly identical to those in *792 Leal . As with the husband in Leal , Blake was soundly sleeping after an evening of heavy drinking. Defendant had the opportunity to observe how deeply Blake was sleeping when he retrieved his cell phone from the couch. The fact Blake *82 was nearby but not in the bed he shared with D.P. leads to the reasonable inference that D.P. would believe the person in her bed committing a sexual act on her, whom she could not see, was her husband and not defendant.
The facts of this case are arguably stronger than those in Leal because the defendant there did not have hair on his back like the victim's husband and he also had facial hair, which the victim's husband lacked. The facts in this case are also very similar to those in Navarro where the defendant stealthily entered the victim's room while she was still asleep and engaged her in sexual intercourse when the victim's husband was not in the room but in the living room drinking alcohol.
The facts here differ from those in Williams in two relevant ways. First, the victim in Williams woke up and talked to the defendant, asking when he had arrived. Second, Williams responded to the victim in a low whisper so she could not detect whether the voice was her husband's. Arguably the concealment in Williams was more active than what occurred in Navarro , Leal , and the instant action. In each of the published authorities as well as here, however, there was intentional concealment by a defendant attempting to hide his identity from the victim, personating another to effectuate a sexual act with the victim.
Defendant's observations of an unconscious husband separated from his unconscious wife-albeit by a short distance-and his stealth in entering D.P.'s bedroom and her bed, show a clever plan intended to deceive. Prior to this incident, defendant was also found next to Taryn in the bed she was sleeping in. Defendant was alert enough to find his phone, call his boss, and to observe the sleeping state of everyone in the house. This is all evidence from which the jury could reasonably find artifice: a clever plan intended to deceive. Slipping into D.P.'s bedroom and bed while she was asleep with her back turned to defendant was an act of pretending from which the jury could reasonably infer pretense under the circumstances.
From the totality of the circumstances, the jury could further infer concealment, which includes both an act of refraining from disclosure and hiding to prevent discovery. Defendant's conduct undeniably involved multiple acts to refrain from disclosing his identity to D.P. When the phone rang and D.P. reached over to answer it, defendant's act of covering himself with a bedsheet involved hiding himself to prevent discovery. We reject defendant's argument that covering himself was incidental to the sexual act because he *793 was still sexually engaging D.P. when the phone rang. Even if defendant had finished the sexual act, by covering himself, he continued his artifice, pretense, and concealment. If we were to conclude the act of defendant covering himself was incidental to the sexual conduct, this concealment demonstrates defendant engaged D.P. without her knowledge that it was defendant and without giving him consent or permission to do so. It was also indicative of defendant's state of mind throughout the incident, as well as his ability to form a plan to conceal himself.
There was substantial evidence before the jury from which it could reasonably find defendant penetrated D.P. by means of artifice, pretense, and concealment. The prosecution established this element of the offense, as well as the other elements of the offense, beyond a reasonable doubt. There was, therefore, no violation of defendant's right to due process. (See *83 In re Winship (1970) 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368.)
II.-III.**
DISPOSITION
The judgment is affirmed.
WE CONCUR:
FRANSON, Acting P.J.
SMITH, J.

See footnote *, ante .