Filed 5/22/23  P. v. Perona CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KASHUS PERONA,<br><br>    Defendant and Appellant. | B317277<br><br>Los Angeles County<br>Super. Ct. No. SA102130 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lauren Weis Birnstein, Judge.  Affirmed.

Brad Kaiserman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, David E. Madeo, Acting Supervisor Deputy Attorney General, and Marc A. Kohm, Deputy Attorney General, for Plaintiff and Respondent.

_____

A jury found Kashus Perona victimized two women: one conviction was for rape by impersonation and the other was for rape by force. Perona challenges the sufficiency of the evidence of rape by impersonation and the court's joinder of the two cases, as well as other rulings. Substantial evidence supports the rape by impersonation conviction. The court acted within its discretion by deciding to hold one trial instead of two. The other rulings were proper. We affirm. Undesignated statutory citations are to the Evidence Code.

I

After a 10-day trial and about three days of deliberation, a jury found Perona guilty of rape by impersonation of Serina L. (Pen. Code, § 261, subd. (a)(5)) and rape by force of Ava M. (*Id.*, subd. (a)(2)).

The jury deadlocked on a third count, rape by use of an intoxicating substance, an alternative theory of the rape of Ava. The court declared a mistrial as to that count.

The court sentenced Perona to eight years in prison.

At trial, three women—Serina, Ava, and Linda N.— testified about sexual encounters with Perona. The conduct was from 2015, 2018, and 2020, respectively. The charges and convictions were for Perona's conduct with Serina and Ava, only. We recount the facts of the three encounters.

Serina was a close friend of Stacey, Perona's girlfriend and the mother of his children. Serina lived with her boyfriend, who was the same height and build as Perona. On April 19, 2015, Perona, Stacey, Serina, Serina's boyfriend, and three other friends came to Serina's home at about 2:45 a.m. after a night of socializing and drinking. Perona was 37 years old.

Serina was too intoxicated to walk. She slid to the floor when her boyfriend tried to help her to bed. Her boyfriend and Perona carried her to her bedroom. There were video cameras in the home but not in the bedroom. The jury saw video of the men carrying Serina to the bedroom.

Serina fell asleep alone, lying on her side. The bedroom had "blackout blinds" and was dark.

Around 3:30 a.m., Serina's boyfriend fell asleep on a couch. Stacey and one friend were sleeping on different couches and another friend was sleeping in a guest room.

The jury saw video from about 5:30 a.m. of Perona stopping at Serina's bedroom door, walking around the house for about three minutes, entering Serina's bedroom, and coming out 10 minutes later.

Serina testified she woke when someone laid down behind her. It was dark and she believed the person was her boyfriend. The person was silent, rubbed her breasts, and put his finger in her vagina. The person put his penis in her vagina and she made a noise. He told her not to be loud. She realized it was not her boyfriend, turned to see Perona, and pushed him away. Perona apologized and left the room.

Serina was scared about immediately reporting what happened. She worried it might destroy her relationship with her boyfriend and with Stacey. She thought her boyfriend might attack Perona.

That night, Serina messaged Perona. She told him she had thought he was her boyfriend and she felt violated. She asked why he was in her bed. Perona responded he "was messed up and that's no excuse" and said he would call her the next day to "clarify and formally apologize."

Serina told her boyfriend about the rape that night.

The next day, April 20, Serina told Stacey, who begged her not to report it. Perona called Serina, apologized, and said it was a "misunderstanding." He also messaged her and said he was "no criminal" and it was a "big misunderstanding."

Serina had a sexual assault examination at a hospital on April 20. She initially was hesitant to talk to police, though, because she did not want people to know what happened. She worried it would bring shame on her family and her children. She ultimately reported the rape to police within one month.

On April 21, Perona messaged Serina and said, for the first time, *she* initiated the sexual contact and he tried to stop it: "[Y]ou're one of my favorite people and I love you like a sister. I came back to give you a big hug, but I didn't touch you until [you] looked at me and then grabbed me. I thought you knew it was me, and I didn't stop you right away, but I did say we've got to stop twice. I apologized and walked out. I allowed things to go too far, but I never wanted that from you and that's why I stopped."

Serina could not think of anything she had done to make Perona think she would consent to sex with him and she reviewed old messages to confirm this belief.

We turn to the second encounter. Ava met Perona at a nightclub in July 2018. They met a second time on August 13, 2018. They had dinner, drank alcohol, and went to a hotel. Ava was considering having sex with Perona. She felt very intoxicated from drinking. Perona offered her half a pill and she swallowed it. Perona either told her or she assumed it was ecstasy. Perona offered more, but she declined.

4

Then Perona changed the situation. He forced a pill in Ava's mouth and shoved it down her throat. Ava believed Perona was going to force her to have sex. She tried to leave, but he threw her on the bed. She said, "Please don't do this. But if you're going to do this, please use a condom." She told him she had a condom in her purse. When Perona got the condom, she texted her roommate the word "help" at 1:22 a.m. on August 14. Ava's memories were hazy, but she believed she tried to run to the door again and Perona pushed her face down on the bed. She screamed and tried to get away. He is about six feet tall and 180 pounds and Ava weighed about 100 pounds. Perona held her down and put his penis in her vagina. She begged him to stop and called him names. Ava lost consciousness. Perona woke her up at about 6:00 a.m. and they left the hotel.

Later that day, Ava told two friends what had happened. Ava went to a hospital, spoke to police, and had a sexual assault examination.

On August 14 or 15, Perona messaged Ava to "apologize for that evening." He said he enjoyed getting to know her and "fe[lt] like that was too much too soon."

We turn to the third encounter. Linda lived in California and was best friends with Stacey's sister, who lived in Arizona. (Recall Stacey is Perona's girlfriend and the mother of his children.) In May 2020, Linda and a large group were visiting Arizona and staying at an Airbnb. The group included Stacey, Perona, their three children, another couple and four children, two other adults, and two other children. Linda had known Perona for more than 10 years. He had never been flirtatious towards her.

5

On May 23, 2020, the adults drank alcohol throughout the day. Linda became intoxicated and fell asleep on an L-shaped couch that evening.

Early the next morning, on May 24, Linda partially awoke when she heard someone moving a couch cushion. She was very tired. Someone moved her on her side and she felt the person lay down behind her, touch her breasts, and insert a finger into her vagina. She woke fully and told the person to stop. She turned and saw Perona. He apologized and left the room. Linda later realized Perona's five- or six-year-old daughter was sleeping on another part of the couch and the moved cushion blocked the daughter's view.

Linda thought she could not tell the group what happened because everyone in the house was related, they felt like family to her, and she did not want the family to see Perona arrested.

She messaged a friend in Los Angeles and said Perona sexually assaulted her when she was sleeping. Linda did not have a car in Arizona. The friend drove to Arizona and arrived at about 1:30 a.m. on May 25. Linda went to a local police station and told an officer what happened. She tried unsuccessfully to get a sexual assault examination. She returned to California without getting an exam.

About a dozen other witnesses testified for the prosecution, including Serina's boyfriend, a forensic nurse, a nurse practitioner, a detective, a police officer, several criminalists, Ava's roommate, one of Ava's friends, and one of Linda's friends.

Perona testified about the encounters with Serina and Ava.

According to Perona, the sex with Serina was "ill-advised," but he did not pretend to be anyone else and Serina knew it was

6

him.  He was not intoxicated.  He "had no reason to believe that [Serina] was drunk."  He thought of her "like a sister."

Before the encounter, he opened the door to Serina's room and saw her in bed, walked around the house, saw everyone sleeping, and then entered the bedroom.  Serina was asleep.  He lept on her bed and grasped her from behind.  She looked up at him and seemed annoyed.  He smiled, "then she was fine," and she laid her head back down.  Perona did not speak.

Serina reached around and started touching his penis and she eventually "directed it to her vagina."  They started to have intercourse.  Then it "hit him" that this was "reckless" and he said, "I'm sorry.  We have to stop."  He thought she looked perplexed.  He left the room.

Perona was caught off guard when Serina messaged him that evening and said she had thought he was her boyfriend.  When he responded and said he "was messed up," he was referring to their infidelity.  He apologized because he "shouldn't have let her pull my penis out. . . .  I shouldn't have allowed us to have sex."  If he had not become "infatuated with . . . the arousal that [Serina] caused, it wouldn't be a legal matter."

Turning to the encounter with Ava, Perona said the sex was consensual and he denied giving her drugs.  They were kissing in the hotel room and Ava told him she had a condom in her purse, which was in Perona's car.  Perona left to get the purse.  This took about 10 to 15 minutes.  When he returned, Ava took the condom out and they had consensual sex.  Ava did not seem drunk.

The jury saw video from the hotel lobby.  The video did not show Ava's purse when they were checking in.  Video from the next morning showed Perona holding the purse when they left.

7

Perona explained he apologized to Ava because she "maybe expressed . . . sadness or regret" about having sex.

The court instructed the jury on CALCRIM No. 1191B. If the jury concluded beyond a reasonable doubt that Perona committed one or more of the charged sex offenses, the instruction allowed the jury to use that as evidence of his propensity to commit the other charged sex offenses.

## II

We affirm the convictions.

## A

Substantial evidence supports Perona's conviction for rape by impersonation.

Rape by impersonation under section 261, subdivision (a)(5) is when the accused, "by artifice, pretense, or concealment," induces another person to submit to sex "under the belief that the person committing the act is someone known to the victim other than the accused," and the accused intends to induce this belief. (An earlier version of this law applied to impersonating the "victim's spouse." In 2013, the Legislature expanded the crime by replacing that language with "someone known to the victim." (Pen. Code, § 261, as amended by Assem. Bill No. 65, Stats. 2013, ch. 259, § 1.))

We review for substantial evidence. (*People v. Fleming* (2018) 25 Cal.App.5th 783, 788 (*Fleming*).) Testimony of one witness can be sufficient. (*Ibid.*) We must accept logical inferences the jury might have drawn from circumstantial evidence. (*Id.* at p. 789.)

Perona says he lacked intent. Two relevant opinions have addressed intent under the law and its predecessor. We summarize this pair of cases.

In *People v. Leal* (2009) 180 Cal.App.4th 782, 789 (*Leal*), the court held a victim's testimony was sufficient to sustain a defendant's conviction for rape by impersonation. The victim was asleep in bed next to her husband. She woke up to someone putting his finger and then his penis in her vagina. She believed it was her husband, but it was Leal, a stranger who had entered the home through a window. (*Id.* at pp. 785–786.)

The jury could infer Leal had the required intent. He quietly entered, the bedroom was dark, it was the middle of the night, and the victim was sleeping next to her husband. (*Leal, supra,* 180 Cal.App.4th at p. 789.) The jury could infer Leal intended the victim to believe Leal was the husband. (*Id.* at pp. 789–790.) Leal's silence "spoke volumes" and tended to prove he was trying to conceal his identity. (*Id.* at p. 790.)

The court applied *Leal* and came to a similar conclusion in *Fleming, supra,* 25 Cal.App.5th at pages 791–793. A group of friends including Fleming came to the victim and her husband's home after a night out. (*Id.* at pp. 785–786.) No one was sober enough to drive and the victim was intoxicated. (*Ibid.*)

The next morning, the victim was asleep in her bedroom. (*Fleming, supra,* 25 Cal.App.5th at p. 786.) Fleming observed the husband soundly sleeping in another room and saw everyone else was asleep. (*Id.* at p. 792.) He quietly entered the victim's bedroom, saw she was asleep facing a wall, approached her from behind without speaking, and put his fingers inside her vagina. (*Id.* at pp. 791–792, 786.) The victim thought he was her husband until her phone rang, she turned to get it, and Fleming pulled the covers over his head. (*Id.* at p. 786.)

The statute requires artifice, pretense, *or* concealment, and the *Fleming* court found evidence of all three. (*Fleming, supra,*

25 Cal.App.5th at p. 793.) There was artifice because Fleming was alert, he knew the unconscious husband was separated from his unconscious wife, he observed everyone else sleeping, and he entered the bedroom stealthily. (*Id.* at p. 792.) There was pretense because Fleming entered the room while the victim was asleep with her back turned. (*Ibid.*) There was concealment based on multiple actions, including Fleming's act of covering himself when the victim turned to get her phone. (*Id.* at pp. 792–793.)

Applying *Leal* and *Fleming*, and viewing the facts in the light favorable to the judgment, there was sufficient evidence of intent. Perona knew many things: Serina shared a bedroom with her boyfriend, the boyfriend was home, Serina knew he was home, the boyfriend was similar in size to Perona, and Serina was so intoxicated she needed to be carried to bed three hours earlier. By walking around the home, Perona knew everyone was asleep. With this knowledge, he quietly entered Serina's dark bedroom. Serina initially was asleep. Perona approached her from behind, touched her, and did not speak until after they began to have sexual intercourse.

Given this context, a jury could find Perona had reason to believe Serina would think Perona was her boyfriend, and that Perona intended this.

There was artifice. Perona scouted the home and knew the boyfriend was apart from Serina and was asleep. This made it less likely the boyfriend would intervene and more likely Serina would think Perona was the boyfriend. Perona also knew Serina was asleep and intoxicated, which made it less likely she would discover his ruse.

There was pretense.  Perona pretended to be the boyfriend, who was similar in size to Perona, by entering the dark room Serina shared with him, by approaching her from behind, and initially by remaining silent.

For similar reasons, there was concealment.  Perona's approach from behind and initial silence in the dark room concealed his identity.

Perona's communications after the rape were also probative of intent.  The jury could reasonably interpret the apology messages to be about his remorse for deceiving Serina.  The jury could also reasonably discredit Perona's belated explanation that Serina knowingly and aggressively pursued him.

Perona asks us to make different inferences, but that would violate the substantial evidence standard of review.

Perona's choice ultimately to speak to Serina in the bedroom does not negate intent.  The reasonable inference is that, when Serina made noise, Perona feared others would hear and would discover the situation.  When Perona told Serina to be quiet, the jury could conclude this was evidence of a guilty mind seeking concealment, not proof of a consciousness free of culpability.

## B

The court acted within its discretion by denying Perona's motion to sever the trial.

Perona moved to sever the trial on the two rapes because, he argued, the separate cases were weak on their own, but strong together.  The court denied the motion.

Penal Code section 954 permits joinder of offenses of the same "class of crimes" and gives courts discretion to sever offenses.  The law prefers consolidation because it usually

promotes efficiency.  (*People v. Simon* (2016) 1 Cal.5th 98, 122 (*Simon*).)

Our review has two phases.  First, we consider the trial court's decision at the time it denied the severance motion.  If the case meets the requirements for joinder, the defendant must make a clear showing of prejudice to establish the trial court abused its discretion.  (*Simon, supra,* 1 Cal.5th at pp. 122–123.)  In the second phase, we consider whether joinder resulted in gross unfairness that denied due process.  (*Id.* at p. 123.)

Beginning with the first phase, this case met the requirements for joinder under Penal Code section 954 because the rapes were in the same class of crimes.  We therefore apply the abuse of discretion standard and consider the following factors:  (1) whether evidence of the charges would be cross admissible in separate trials, (2) whether a charge was "unusually likely" to inflame the jury against the defendant, (3) whether one or more charges were weak, and (4) whether a charge was a capital offense or joinder converted the matter into a capital case. (*Simon, supra,* 1 Cal.5th at p. 123.)

Evidence of the two rapes was cross admissible under section 1108.  Generally, character evidence is inadmissible to prove a person's conduct on a certain occasion.  (§ 1101, subd. (a).)  Evidence a defendant committed a crime is admissible, however, to prove certain facts such as absence of mistake or intent. (§ 1101, subd. (b).)  Section 1108 modifies section 1101 in criminal cases involving a sexual offense.  In such cases, section 1101 does not prevent the admission of evidence of the defendant's commission of other sexual offenses.

The Legislature enacted section 1108 to "relax" the constraints of section 1101 and to ensure factfinders know about

12

defendants' other sex offenses when evaluating victims' and defendants' credibility. (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).) Section 1108 evidence can be used to prove defendants' propensity to commit sexual offenses. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1164 (*Villatoro*).)

Section 1108 is subject to the constraints of section 352, which gives courts discretion to exclude evidence if the probative value is substantially outweighed by the probability that admission will require undue consumption of time or will create a substantial danger of undue prejudice or of misleading the jury.

When determining whether to exclude section 1108 evidence under section 352, courts consider several factors, including: whether it is probative; whether it is stronger and more inflammatory than evidence of the charged acts; whether it is remote or stale; whether it is likely to confuse or distract the jurors; and whether it will require an undue consumption of time. (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117.)

For the first joinder factor, the evidence of the two rapes was cross admissible under section 1108 as propensity evidence.

Section 352 did not bar admission of this evidence. The evidence was probative due to the similarities between the conduct: vaginal penetration of intoxicated women who did not consent to sex with him. As we explain below when we discuss the second and third joinder factors, both cases were strong and neither was more inflammatory. The 2015 conduct was not remote in time from the 2018 conduct. There is no reason to think cross admission would confuse or distract the jurors or unduly consume time. The evidence was cross admissible.

For the second and third joinder factors, neither case was particularly inflammatory in relation to the other and both were

strong.  The animating concern is not whether one offense is repulsive, but whether strong evidence of a lesser but inflammatory charge may bolster a weak charge.  (*Simon*, *supra*, 1 Cal.5th at p. 124.)  Perona contends the charges were inflammatory in *different* ways, but he does not demonstrate a clear showing of prejudice.  He cites *People v. Earle* (2009) 172 Cal.App.4th 372, 378 and 384, which involved joinder of a misdemeanor indecent exposure charge with an assault with intent to commit rape charge.  This was improper because the assault evidence was "considerably weaker," the crimes had "no distinguishing characteristics in common," and indecent exposure did not rationally support an inference the defendant had a propensity to commit rape.  (*Id*. at pp. 378, 395–396.)

Here, each case was relatively strong.  The women quickly reported the rapes and got sexual assault exams.  They did not know one another, and had personal reasons *not* to report the rapes.  The video in Serina's case showed Perona checking everyone was asleep to help him accomplish the impersonation.  The "help" text in Ava's case was evidence Perona used force.  Perona's messages to the victims after the encounters strengthened the cases.  His apologies tended to show his guilt.  His delay in telling Serina he thought she knowingly and aggressively pursued him tended to show that was untrue.

Here, neither case was weak, they had commonalities, and rape by one method can rationally support an inference of propensity to commit rape by another method.  (See *Villatoro*, *supra*, 54 Cal.4th at p. 1164 [quoting legislative history that said, "The propensity to commit sexual offenses is not a common attribute among the general public," so propensity evidence is "especially probative"].)  Perona has not shown prejudice.

14

The fourth joinder factor does not apply because there was no capital offense.

The court did not abuse its discretion by denying Perona's joinder motion.

Turning to the second phase, joinder did not deny Perona a fair trial or due process. Courts affirm unless it is reasonably probable joinder influenced the jury in its guilty verdict. (*Simon, supra*, 1 Cal.5th at pp. 129–130.) The court instructed the jurors that the prosecution needed to prove *each* charge beyond a reasonable doubt. The jurors therefore needed to consider each count separately. We presume the jury follows instructions, and Perona has not made a contrary showing. (See *id.* at p. 130.) The fact the jury deadlocked on one charge strongly suggests it weighed the evidence and differentiated among the charges. (See *ibid.*) Joinder did not make the trial grossly unfair.

C

The court properly instructed the jury using CALCRIM No. 1191B. If the jury concluded beyond a reasonable doubt Perona committed one or more of the charged sex offenses, this instruction allowed but did not require the jury to use that guilty finding as evidence of his propensity to commit the other charged sex offenses. The Supreme Court has approved the language of this instruction. (*Villatoro, supra*, 54 Cal.4th at pp. 1167–1168.)

Perona contends the court erred because it needed to but did not conduct a section 352 analysis before giving the instruction, but we infer the court indeed applied this analysis. We may make this inference " 'on the basis of record indications *well short* of an express statement.' " (*Villatoro, supra*, 54 Cal.4th at p. 1168.) CALCRIM No. 1191B is based on section 1108, which expressly refers to section 352. Furthermore, the

15

parties and the court extensively discussed section 352 for the issues of joinder and admission of Linda's testimony, both of which involved section 1108. The court discussed the "balancing test" and the "weighing process," and pressed the prosecution to explain the probative value of the section 1108 evidence. The court conducted the proper section 352 balancing when it gave CALCRIM No. 1191B.

D

The court's evidentiary rulings were proper.

We review evidentiary rulings for an abuse of discretion and we reverse only if Perona shows the trial court acted arbitrarily or absurdly. (See *People v. Powell* (2018) 5 Cal.5th 921, 951.)

The court properly admitted evidence about Linda under section 1108. This evidence had substantial probative value that was not substantially outweighed by risk of prejudice, and the admission did not make the trial fundamentally unfair.

Evidence Perona assaulted Linda was probative of Perona's propensity to engage in sexual conduct without consent and tended to prove he was not mistaken about consent. The three encounters were also proximate in time.

There were similarities between Perona's conduct with Serina and Linda. Each woman had known Perona for years and the conduct took place in group settings involving alcohol. There was a degree of safety and trust in these environments that Perona exploited. He approached the women from behind and touched them in similar ways. Like Serina, Linda did not know who was behind her. This corroborated Serina's claim that Perona could begin sexual contact with her without her realizing

it was him. The jury properly could infer Perona repeated an approach he believed would gain his objective.

The court's rulings and the conduct Linda alleged limited potential prejudice. Perona contends it was unfair to admit the evidence because prosecutors in Arizona might bring charges against him, so his incentive was to avoid testifying about it. The court limited prejudice by forbidding the prosecution from cross-examining Perona about the encounter unless he testified about it. Hard choices about whether to testify are not unconstitutional. (*People v. Frye* (1998) 18 Cal.4th 894, 940, overruled on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390.) The court also instructed the jury not to consider whether Perona had been punished for his conduct with Linda. Lastly, prejudice was limited because the evidence was less inflammatory than the charged conduct, which involved sexual intercourse rather than just digital penetration. The court did not abuse its discretion by admitting this probative evidence.

Perona raises federal and state due process challenges to section 1108. He concedes, and we agree, we are bound by the California Supreme Court's rejection of this same challenge in *Falsetta, supra*, 21 Cal.4th at pages 910–922. (See *Auto Equity Sales v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Perona incorrectly challenges three more evidentiary rulings. These are about the admission of: Serina's boyfriend's testimony about what Serina told him after the rape, Ava's statements to a nurse, and Linda's text to a friend. Perona raised but withdrew a fourth challenge.

Admission of the testimony from the boyfriend was harmless under any standard. This testimony largely mirrored Serina's testimony. He said Serina told him Perona entered the

17

bedroom, approached her from behind, and she thought he was the boyfriend. Perona's argument at trial was that Serina had consensual sex with Perona and she made up the rape story to hide infidelity from her boyfriend. On this theory, Serina made up the story that Perona impersonated her boyfriend for the purpose of lying to her boyfriend. The boyfriend encouraged her to report the rape, and Serina had to keep repeating the same false story to maintain the lie to him. The fact the boyfriend heard and testified to a similar account to the account Serina gave at trial is consistent with the defense theory and therefore proved little.

The court did not abuse its discretion by admitting Ava's statements to the nurse. On August 14, 2018, Ava told the nurse the following about her encounter with Perona that same day: he forced a pill down her throat and made her swallow it with vodka, he held her down, she hit his face, he wore a condom and at some point removed it, and the drugs and alcohol made her lose awareness. The court admitted these statements for two purposes: the effect on the listener, and as prior consistent statements. Perona concedes these statements were admissible for the first purpose, but challenges the second purpose.

These were prior consistent statements. Evidence of a prior consistent statement is admissible to support a witness's credibility if: (1) the court admits evidence of the witness's inconsistent statement to attack the witness's credibility (§ 791, subd. (a)) or (2) someone alleges an improper motive influenced the witness's testimony. (*Id.*, subd. (b).) There is a temporal requirement: the witness must have made the consistent statement before the alleged inconsistent statement or before the witness had the alleged improper motive. (*Id.*, subd. (a) & (b).)

Perona made broad as well as specific attacks on Ava's credibility. During opening argument, defense counsel said Ava's statements over time were "so inconsistent, contradictory, and unreliable" that she must be lying. In closing, defense counsel noted Ava grew up in Texas and she might have been saying " 'Black Man raped me' and, therefore, every one of you should believe it." "[I]t could just be that this is no different than Emmett Till or Tom Robinson." Defense counsel cross-examined and tried to impeach Ava with evidence from her interview with a detective on September 12, 2018. This included statements in which she expressed uncertainty about whether she actually ran for the door and hit Perona or whether she was just dreaming. Ava testified she was not dreaming. She did try to punch Perona and she did run for the door.

Perona attacked Ava's credibility by suggesting her statements were inconsistent. Section 791 therefore entitled the prosecution to admit evidence of consistent statements Ava made *before* the alleged inconsistent statements to the detective to bolster her credibility. Ava's statements to the nurse met this temporal requirement. The court acted within its discretion by admitting this evidence as prior consistent statements. This adherence to the Evidence Code did not make the trial fundamentally unfair.

Perona has forfeited a challenge to the court's admission of a text message Linda sent to her friend. (See *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573 [appellant has burden affirmatively to demonstrate error].) The court admitted the message under the fresh complaint doctrine and to show Linda's state of mind. Perona's opening brief quoted the court's "fresh complaint" ground, but it cited no law about that ground and

made no argument about why it did not apply. He has not demonstrated error.

In sum, Perona has not proven evidentiary error.

E

The trial court properly denied Perona's motion to dismiss based on alleged failure to collect evidence. Substantial evidence supports the court's finding that law enforcement did not act in bad faith.

This issue is about Ava's purse and surveillance video from the hotel lobby. There was video of Ava and Perona entering after midnight and video of them departing after 6:00 a.m. Perona alleged law enforcement lost or destroyed video between those times.

According to Perona, the video mattered because the entry video did not show Ava's purse, but the departure video did. He says the missing video would have shown him leaving to get Ava's purse. This would have undermined Ava's testimony, he says, because she did not escape or call for help when he left. Perona says the footage would have been critical to his defense and law enforcement's failure to collect or preserve it was in bad faith. Perona moved to dismiss the case on this basis a month before trial.

Perona redacted some of his motion to dismiss and had two ex parte hearings about the issue. This was a strategic choice based on defense counsel's belief the prosecution and detective did not know Perona may have left the room to get the purse.

In a hearing with the prosecution and defense, a detective testified about the video. The detective originally knew the general area of the hotel, but not the name of the hotel. He made a list of hotels in that area and visited two or three hotels on

20

August 29, 2018. An employee at one hotel confirmed Perona had stayed there. The detective did not recall the specific conversation, but his practice when seeking video footage was to give a timeline of the information he knew. In this case, he knew an approximate check-in and check-out time, and his common practice would have been to ask for video from those times.

The detective returned to the hotel about a week later and the employee showed him video of Perona and Ava arriving and video of them leaving six hours later. Based on Ava's statement to the responding officer, the detective had no reason to think she had been in the lobby other than when she entered and departed. The detective saved the arrival and departure video clips. The manager of the hotel said the surveillance video was deleted after three months.

The court denied Perona's motion to dismiss. It found the detective "very credible" and found he had seen only the arrival and departure videos. The court found law enforcement had no duty to collect more video, it did not know anyone may have left the room, and the defense had other ways to present evidence on this topic.

Due process requires law enforcement to preserve evidence that has "an exculpatory value that was apparent before the evidence was destroyed," and is of such a nature the defendant could not get comparable evidence by other reasonably available means. (*California v. Trombetta* (1984) 467 U.S. 479, 489.) For the government's failure to preserve potentially useful evidence to rise to a due process violation, the defendant must show bad faith. (*Arizona v. Youngblood* (1988) 488 U.S. 51, 58.) Bad faith turns on law enforcement's knowledge of the exculpatory value of

the evidence at the time it was lost or destroyed. (*Id.* at p. 56, fn. *.)

We uphold a ruling on this type of motion if substantial evidence supports it. (*People v. Montes* (2014) 58 Cal.4th 809, 837.)

Substantial evidence does support the finding the evidence lacked apparent exculpatory value before it was destroyed. There is no evidence that, within the three months before the video was deleted, the video's potential exculpatory value was apparent. There is no evidence law enforcement knew or should have known Perona or Ava left the room outside of their joint arrival and departure. The court found the detective credible. The detective never saw the full video and had no reason to think Perona or Ava were in the lobby at other times.

Defense counsel's treatment of this issue bolsters this finding. Counsel redacted the motion and had ex parte hearings because he believed the prosecution and detective did *not* know Perona may have left the room. This means the video's exculpatory value was not apparent even on the eve of trial. The issue is whether the exculpatory value was apparent, not whether the investigation was perfect. As the trial court correctly explained, the detective was not held to a standard of "best investigator possible." The evidence lacked apparent exculpatory value before it was destroyed.

Substantial evidence also supports the court's finding that Perona could address this topic with other evidence. Through the entry and departure videos, defense counsel could, and did, argue Perona must have left to get the purse. In closing argument, defense counsel repeatedly emphasized this issue. Counsel said, "The whole purse thing disproves everything" and "it's nuclear."

Counsel explained it was "clear" the purse was not in the hotel room because "[t]he video showed that."

In sum, the exculpatory value was not apparent before the evidence was destroyed and the defendant had comparable evidence. The court properly denied Perona's motion to dismiss.

F

There was no cumulative prejudicial error.

**DISPOSITION**

The judgment is affirmed.


WILEY, J.


We concur:


STRATTON, P. J.


GRIMES, J.


23